John Heenan
Joe Cook
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Phone: (406) 839-9091
Fax: (406) 839-9092
john@lawmontana.com
joe@lawmontana.com

Roger Sullivan
Ethan A. Welder
Dustin A. Leftridge
Jinnifer Jeresek Mariman
McGARVEY LAW
345 First Ave. East
Kalispell, MT 59901
Phone: (406) 752-5566
Fax: (406) 752-7124
rsullivan@mcgarveylaw.com
ewelder@mcgarveylaw.com
dleftridge@mcgarveylaw.com
jmariman@mcgarveylaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DITRICT OF MONTANA
BUTTE DIVISION**

| | |
|---|---|
| Estate of Arthur Vidrich, by and through Christopher Vidrich as Personal Representative, | Case No. CV-21-1-BU-BMM |
| Michelle Frances Sullivan, | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Estate of Diane M. Mulcahy, by and through Janet Shea and Amy Hopewell as Co-Personal Representatives, | |
| Estate of Donna Kelly, by and through Dan Kelly as Personal Representative, | |
| Estate of Linda Sue Fabian, by and through Heidi Bara as Personal Representative, and | |
| Emmett Waddell, | |

1

|  Plaintiffs, |  |
| --- | --- |
| vs. |  |
| Continental Care and Rehabilitation Center (d/b/a); Sweetwater Butte Opco, LLC; Sweetwater Care MT OPCO, LLC; Sweetwater Care OPCO LLC; Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity; Sweetwater Care Resource, LLC; David Merrell; James Gamett; Aaron Chesley; Kyle Shields; and Does A-Z, |  |
| Defendants. |  |

Pursuant to Rule 15(b), Fed. R. Civ. P., Plaintiffs file this First Amended Complaint as a matter of course. This First Amended Complaint is filed prior to any responsive pleading having been served by Defendants. Plaintiffs, through counsel, allege and state upon information and belief.

## INTRODUCTION

1.      This amended complaint alleges treatment of elders from our community, which is both negligent and a violation of their fundamental right to be treated with human dignity.  It seeks to recover all damages for the injuries, suffering, and deaths of Arthur Vidrich, Diane M. Mulcahy, Donna Kelly and Linda Sue Fabian; and injury and suffering of Michelle Frances Sullivan and Emmett Waddell who received negligent and sub-standard care and/or were neglected, abused, malnourished or otherwise mistreated resulting in injuries and compromised health conditions. Secondarily, some of these health compromised Plaintiffs were unnecessarily exposed to, contracted or died of COVID-19; experienced unnecessary complications related to COVID-19 as a result of the negligent management and business practices and resulting neglect they suffered while living as residents at Continental Care and Rehabilitation Center in Butte, Montana (the "facility"). Due to their compromised health conditions resulting from the negligent care and management of Defendants, many of the Plaintiffs were unable to survive and/or fully recover

2

from their subsequent COVID-19 infections. Arthur Vidrich and the other group members were elder persons or persons with other medical conditions and disabilities requiring rehabilitation and other services from the Defendants' nursing home facility. Defendants failed to provide adequate and basic personal care to residents, failed to maintain adequate staffing and funding to meet the reasonable care needs of its residents, failed to provide a safe environment, and failed to inform resident representatives of the deteriorating conditions inside the facility. Furthermore, the Defendants failed to establish and maintain a basic and reasonable infection prevention and control program, designed to provide and maintain a safe and sanitary environment for this at-risk population of residents. Defendants failed their resident population and the loved ones of the residents, which has resulted in unnecessary suffering, loss of life, potential lifelong health complications, and other injury as a result.

## **PARTIES**

2. Plaintiff 1 is the Estate of Arthur Vidrich, by and through the Estate's Personal Representative, Christopher (Chris) Vidrich. Chris Vidrich is the son of Arthur Vidrich and is a resident of Silver Bow County, Montana. Arthur Vidrich was a resident of Silver Bow County, Montana prior to his death.

3. Plaintiff 2 is Michelle Henricks, with Power of Attorney by and over her mother, Michelle Sullivan. Michelle Henricks is the daughter of Michelle Sullivan and is a resident of Silver Bow County, Montana. Michelle Sullivan is also a resident of Silver Bow County, Montana.

4. Plaintiff 3 is the Estate of Diane M. Mulcahy, by and through the Estate's Personal Co-Representatives, Janet Shea and Amy Hopewell. Janet Shea and Amy Hopewell are the daughters of Diane M. Mulcahy, and are residents of Silver Bow County, Montana. Diane M. Mulcahy was a resident of Silver Bow County, Montana prior to her death.

3

5.    Plaintiff 4 is the Estate of Donna Kelly, by and through the Estate's Personal Representative, Dan Kelly. Dan Kelly is the spouse of Donna Kelly and is a resident of Silver Bow County, Montana. Donna Kelly was a resident of Silver Bow County, Montana prior to her death.

6.    Plaintiff 5 is the Estate of Linda Sue Fabian, by and through the Estate's Personal Representative, Heidi Bara. Heidi Bara is the sister of Linda Sue Fabian and is a resident of Silver Bow County, Montana. Linda Sue Fabian was a resident of Silver Bow County, Montana prior to her death.

7.    Plaintiff 6 is Everett Waddell. Mr. Waddell is a resident of Silver Bow County, Montana.

8.    Other Plaintiffs may be named, who are similarly situated individuals, or their Estates, who were injured, suffered, and/or died as a result of the negligent care and mistreatment they incurred while living as residents at Continental Care and Rehabilitation Center in Butte, Montana.

9.    Defendant Continental Care and Rehabilitation Center is an assumed business name under which Sweetwater Butte Opco, LLC owns and operates a "long term care facility" and/or "skilled nursing facility" at 2400 Continental Dr., City of Butte, Silver Bow County, Montana 59701 (referred to herein as the "facility").

10.    Defendant, Sweetwater Butte Opco, LLC, d/b/a Continental Care and Rehabilitation Center, is, or was, a for-profit limited liability company organized and existing under the laws of the State of Montana, doing business at Defendants' facility at 2400 Continental Dr., City of Butte, Silver Bow County, Montana 59701, and with a principal business office at 662 Encinitas Blvd Ste 216, Encinitas, California 92024-6792. Upon information and belief, Sweetwater Butte OPCO, LLC took over ownership and management of the Continental Care and

4

Rehabilitation Center in May 2019. Upon information and belief, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC is a Nevada for-profit limited liability company and is a listed Manger/Member of Sweetwater Butte Opco, LLC d/b/a Continental Care and Rehabilitation Center. Upon information and belief, Sweetwater Care Opco, LLC is a Nevada for-profit limited liability company and is, along with James Gamett, the Indirect Owner of Sweetwater Butte Opco, LLC. Upon information and belief, Sweetwater Care Resource, LLC, is a California for-profit limited liability company with control of, oversight of, and/or association with Sweetwater Butte Opco, LLC. Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, is a Delaware for-profit limited liability company with its principal place of business similarly located at 662 Encinitas Blvd Ste 230, Encinitas, California 92024-6792. Upon information and belief: Defendant, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, is the parent company of Sweetwater Butte Opco, LLC, Sweetwater Care Resource, LLC, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Opco, LLC; and/or Defendant, Sweetwater Butte Opco, LLC, Sweetwater Care Resource, LLC, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Opco, LLC are subsidiary companies of Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity; and/or Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity company, Sweetwater Butte Opco, LLC, Sweetwater Care Resource, LLC, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Opco, LLC are affiliated and/or associated entities. Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity company, Sweetwater Care Resource, LLC, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Propco, LLC, Sweetwater Care Opco, LLC, and Sweetwater Butte Opco, LLC share common and/or overlapping identity, ownership, financial assets, business assets, insurance

coverage, management structure, members, offices, accounting, and/or principal place of business with each other and with the other Sweetwater entities referenced in this Complaint and/or that have yet to be discovered.

11.    Defendant Sweetwater Care MT Opco, LLC is a Nevada LLC and is a listed Manager/Member of Sweetwater Butte Opco, LLC d/b/a Continental Care and Rehabilitation Center. James Gamett is listed with the Nevada Secretary of State as the registered agent of this entity.   James Gamett and Aaron Chesley are listed as the managers of this entity. Upon information and belief, Sweetwater Care MT Opco, LLC is a Nevada for-profit limited liability company with control of, oversight of, and/or association with Sweetwater Butte Opco, LLC.

12.    Upon information and belief, Defendant, Sweetwater Care Opco, LLC is, or was, a Nevada LLC and is, along with James Gamett, an Indirect Owner of Sweetwater Butte Opco LLC. There is also an associated/alter ego entity registered in Nevada with the name of Sweetwater Care Propco, LLC.  These entities both have an individual named Jason Gamett listed as their registered agent.  The Managing Members of both entities are listed as AJC Healthcare, LLC and JBG Partners, LLC.  AJC Healthcare, LLC is reportedly a Utah entity owned and managed by Aaron John Chesley. JBG Partners, LLC is reportedly a Nevada entity owned and managed by both James Bunker Gamett and Jason Gamett. Upon information and belief, Sweetwater Care Opco, LLC is a Nevada for-profit limited liability company with control of, oversight of, and/or association with Sweetwater Butte Opco, LLC.

13.    Defendant Sweetwater Care Resource, LLC is a California LLC with its principal place of business similarly located at 662 Encinitas Blvd., Suite 230, Encinitas, California 92024-6792. This entity is owned and managed by Defendants James Gamett and Aaron Chesley.  Kyle Shields is listed with the California Secretary of State as the Controller of Sweetwater Care Resource, LLC.  Upon information and belief, Sweetwater Care Resource, LLC has control of,

6

oversight of, and/or association with Sweetwater Butte Opco, LLC.  Upon information and belief, insurance policies procured, by and issued to, Sweetwater Care Resource, LLC provide coverage for claims made against Sweetwater Bute Opco, LLC.  On November 9, 2020, following the filing of a lawsuit regarding the associated entity of Sweetwater Whitefish Opco, LLC, the managing member of Sweetwater Care Resource, LLC was changed from James Bunker Gamett to JBG Partners and the registered agent was changed from James Gamett to Kyle Shields.  JBG Partners, LLC is reportedly a Nevada entity owned and managed by both James Bunker Gamett and Jason Gamett.

14.    Defendant Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, is a Delaware LLC with its principal place of business similarly located at 662 Encinitas Blvd., Suite 230, Encinitas, California 92024-6792.  Upon information and belief: Defendant, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, is the parent company of Sweetwater Butte Opco, LLC, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Propco, LLC, Sweetwater Care Opco, LLC, and Sweetwater Care Resource, LLC; and/or Defendant, Sweetwater Butte Opco, LLC, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Resource, LLC are  subsidiary companies of Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity; and/or Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity company, Sweetwater Butte Opco, LLC, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Resource, LLC are affiliated and/or associated entities. Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity company, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Resource, LLC and Sweetwater Butte Opco, LLC share

7

common and/or overlapping identity, ownership, financial assets, business assets, insurance coverage, management structure, members, offices, accounting, and/or principal place of business. Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity is an owner, primary shareholder, parent company, or affiliated/associated entity of numerous other Sweetwater LLCs created under the laws of Montana (Sweetwater GF Opco, LLC, Sweetwater GF Propco, LLC, Sweetwater Whitefish Opco, LLC, Sweetwater Dillon Opco LLC, Sweetwater Dillon Propco, LLC) and other States (Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Resource, LLC) for the purpose of owning, managing, operating and channeling income from at least three other similar care facilities across Montana (Whitefish Care and Rehabilitation Center in Whitefish, Park Place Transitional Care and Rehabilitation Center in Great Falls, and Pioneer Care and Rehabilitation Center in Dillon). Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity is an owner, primary shareholder, parent company, or affiliated/associated entity of numerous other Sweetwater LLCs created under the laws of this and other State's for the purpose of owning, managing, and operating, and channeling income from this and other similar care facilities across the nation. Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity Company, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC, Sweetwater Care Propco, LLC, Sweetwater Care Resource, LLC, and Sweetwater Butte Opco, LLC share common and/or overlapping identity, ownership, financial assets, business assets, insurance coverage, management structure, members, offices, accounting, and/or principal place of business with these other Sweetwater LLCs which were created for the purpose of owning, managing, operating, and channeling income from this and other similar care facilities in this and other Counties and States.

15. Defendant David Merrell is the Executive Director and Administrator of Sweetwater Butte Opco, LLC, d/b/a Continental Care and Rehabilitation Center in Silver Bow County, located at 2400 Continental Dr., Butte, Montana 59701. Upon information and belief, Mr. Merrell is a resident of Silver Bow County, Montana.

16. Defendant James Gamett is an owner and/or managing member of Sweetwater Butte Opco, LLC, managing partner of Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, is or was owner and/or managing member of Sweetwater Care Resource, LLC and its controlling company JBG Partners, LLC, and based on information and belief has ownership interests, financial interests, and/or management positions in each of the Defendant entities referenced in this complaint. Mr. Gamett was also listed as the registered agent of Sweetwater Butte Opco, LLC, Sweetwater Whitefish Opco, LLC and Sweetwater Care Resource, LLC until this, and other business information regarding multiple Sweetwater entities was formally changed with Secretaries of various States on or around November 9, 2020, following the filing of a lawsuit regarding the associated entity Sweetwater Whitefish Opco, LLC. Upon information and belief, Mr. Gamett convened a meeting for all Sweetwater entities' directors and administrators at the Marriott Hotel in Salt Lake City, Utah in May 2020, during which he identified himself as "the owner" of Sweetwater entities, that he was "not into healthcare" but rather was "an entrepreneur," and that his goal was always "to get people in at all costs" with respect to Sweetwater's long-term care facilities. Upon information and belief, Mr. Gamett is an owner of numerous other Sweetwater LLCs created under the laws of Montana (Sweetwater GF Opco, LLC, Sweetwater GF Propco, LLC, Sweetwater Whitefish Opco, LLC, Sweetwater Dillon Opco LLC, Sweetwater Dillon Propco, LLC) and other States (Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC, Sweetwater Care Propco, LLC, and Sweetwater Care Resource, LLC) for the purpose of owning, managing, operating, and channeling

9

income and profits from this facility and at least three other similar care facilities across Montana (Whitefish Care and Rehabilitation Center in Whitefish, Park Place Transitional Care and Rehabilitation Center in Great Falls, and Pioneer Care and Rehabilitation Center in Dillon). Upon information and belief, Mr. Gamett has ownership interests, financial interests, and/or management positions in numerous other Sweetwater entities created under the laws of other State's for the purpose of owning, managing, operating, and channeling income from this and other similar care facilities across the nation. Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity company, Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC, Sweetwater Care Propco, LLC, Sweetwater Care Resource, LLC and Sweetwater Butte Opco, LLC share common and/or overlapping identity, ownership, financial assets, business assets, insurance coverage, management structure, members, offices, accounting, and/or principal place of business with each other and with the other Sweetwater LLCs, which were created for the purpose of owning, managing, operating, and channeling income from, this and other similar care facilities in other Counties and States. Mr. Gamett is also listed as the Managing Partner and Founder of Sweetwater Capital Partners, which, upon on information and belief, is another associated/alter ego entity with a similar common identity. Upon information and belief, Mr. Gamett has management and ownership interests in a myriad of other Sweetwater entities created in multiple states, for which the relevance and relation to this action has yet to be discovered, including Sweetwater Capital Advisors, Sweetwater Capital Advisors, LLC, SW Secondaries II B, LLC, Sweetwater Revelation, LLC, and Sweetwater Secondaries Fund II GP, LLC. Based on information and belief, Mr. Gamett is a resident of San Diego County, California.

17. Upon information and belief, Defendant Aaron Chesley is an owner or managing member of Sweetwater Butte Opco, LLC, Co-Founder CEO of Sweetwater Care a/k/a Sweetwater

10

Care MT Opco, LLC, and Sweetwater Care Opco LLC, Manager of Sweetwater Care MT Opco, LLC, Owner and Manager of AJC Healthcare, LLC and, based on information and belief, has ownership interests, financial interests, and/or management positions in each of the defendant entities referenced in this complaint and other associated entities including Sweetwater Care Propco, LLC, and Sweetwater Care Resource, LLC. Based upon information and belief, Mr. Chesley is a resident of Wasatch County, Utah.

18.     Defendant Kyle Shields is the Chief Financial Officer of Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, and Sweetwater Care Opco, LLC and, based on information and belief, has ownership interests, financial interests, and/or management positions in other defendant entities referenced in this complaint. Mr. Shields is listed with the California Secretary of State as the Controller and registered agent of Sweetwater Care Resource, LLC and the registered agent of Sweetwater Butte Opco, LLC.  Based on information and belief, Mr. Shields is a resident of San Diego County, California.

19.     Defendants Does A-Z are corporations, companies, or persons unknown at this time whose negligence and wrongful acts caused injury to Plaintiffs, who were unjustly enriched at the expense of Plaintiffs, or who are otherwise liable for the injuries and damages alleged in this suit. Plaintiffs will seek to amend their complaint when the true names and capacities of Does A-Z are ascertained.

## JURISDICTION AND VENUE

20.     Montana's Silver Bow County District Court has jurisdiction over this matter pursuant to Rule 4(B), M.R. Civ. P., and venue is proper in Silver Bow County, Montana.

## ALLEGATIONS COMMON TO ALL COUNTS

21.     Defendants are licensed by the State of Montana to operate a 100-bed care facility, whereby they provide senior care services and amenities for facility residents, including: semi-

11

private and private rooms; assistance with non-medical needs: toileting, bathing and grooming; caregivers; meal preparation with special dietary guidelines; alert mobility and care needs, including exercise, health and wellness programs, activities, outdoor excursions, and transportation; and Memory Care. Defendants' facility is regulated by the Department of Public Health and Human Services, Quality Assurance Division of Montana. Defendants' facility is also certified as a provider by the Centers for Medicare and Medicaid Services "CMS" (requiring it to follow directives issued by CMS).

22.     In March 2018, Mr. Vidrich was admitted to Defendants' facility following a stroke for rehabilitation. While a resident at Defendants' facility, he contracted COVID-19 in October 2020. He was then transferred to the hospital on November 6, 2020, as he was nonresponsive, and his COVID-19 condition was worsening. At that time, Stage IV bed sores on his coccyx and between his toes were detected. Mr. Vidrich died as a result of COVID-19 on the date of his transfer to the hospital.

23.     On July 30, 2014, Mrs. Sullivan was admitted to the Defendants' facility where she contracted COVID-19 in October 2020 requiring her to be hospitalized. Following a prolonged stay at the hospital due to her COVID-19 diagnosis, Mrs. Sullivan was transferred back to the Defendants' facility on November 10th. Mrs. Sullivan suffered various injuries as a result of the insufficient care received under Defendants tenure at the facility.

24.     In 2015, Mrs. Mulcahy was admitted to the Defendants' facility due to her Alzheimer's Disease. While a resident at the Defendants' facility, she contracted COVID-19 in October 2020. Mrs. Mulcahy lost consciousness and died as a result of COVID-19 on November 5, 2020. Mrs. Mulcahy suffered various injuries as a result of the insufficient care received under Defendants' tenure at the facility.

25. In April 2018, Mrs. Kelly was admitted to the Defendants' facility due to her Alzheimer's Disease. While a resident at the Defendants' facility, she contracted COVID-19 in November 2020. Mrs. Kelly died as a result of COVID-19 on November 17, 2020. Mrs. Kelly suffered various injuries as a result of the insufficient care received under Defendants' tenure at the facility.

26. On October 17, 2020, Ms. Fabian was admitted to the Defendants' facility following treatment for MRSA at St. James Hospital in Butte, Montana for short-term care. Ms. Fabian died as a result of COVID-19 on October 30, 2020, with onset of three (3) days.

27. In June 2020, Mr. Waddell was admitted to the Defendants' facility following hospitalization for brain injury. Mr. Waddell has suffered various injuries as a result of the insufficient care received under Defendants' tenure at the facility.

28. Defendants entered into, or assumed the terms of, agreements with Mr. Vidrich, Mrs. Sullivan, Mrs. Mulcahy, Mrs. Kelly, Ms. Fabian and Mr. Waddell, and/or their agents, and the other similarly impacted individuals, whereby Defendants agreed to provide to Mr. Vidrich, Mrs. Sullivan, Mrs. Mulcahy, Mrs. Kelly, Ms. Fabian and Mr. Waddell, and the other similarly impacted individuals with long-term care including non-medical needs such as dressing, eating, personal care, bathroom and bathing assistance, preparation and delivery of daily meals, and the provision of patient centered rehabilitation.

29. Mr. Vidrich, Mrs. Sullivan, Mrs. Mulcahy, Mrs. Kelly, Ms. Fabian and Mr. Waddell received inadequate care and supervision almost immediately upon Defendants' assumption of responsibility for their care as a result of Defendants': failure to provide adequate funding, staffing, and management necessary to ensure residents were receiving reasonable care in regard to showers/bathing, proper nutrition, physical therapy and activity, turning of patients that required these services to avoid the development of bed sores, clean and sanitary rooms,

13

bathrooms, clothes, and sheets, regular changing of briefs, catheters, and necessary medical equipment, facility maintenance, cleanliness, and sterilization of the facility, equipment, and appliances, regular bathroom visits for those who require bathroom assistance, responsiveness to patient call lights/assistance requests, responsiveness to family member inquiries, skin and wound care, prevention of infections including those of the urinary tract and open sores, meeting medical and medication needs of clients, and otherwise ensuring the safety and health of the residents; failure to establish and maintain a basic and reasonable infection prevention and control program designed to provide and maintain a safe and sanitary environment for this at-risk population of residents; failure to provide for and follow public health guidelines issued by the Montana Department of Public Health and Human Services and the Centers for Medicare and Medicaid regarding the prevention of COVID-19 at its nursing care facility; failure to maintain reasonable distancing among residents; inadequate staffing; inadequate training of staff; and failure to appropriately respond to complaints, warnings, and violations of regulations, recommendations, and guidelines. As a result, Defendants failed to protect the residents of the Continental Care and Rehabilitation Center, including the named Plaintiffs and other similarly situated individuals, from injury, suffering, and death.

30.   COVID-19 is a respiratory illness that has been declared a worldwide pandemic. Persons with chronic underlying medical conditions are at greater risk for COVID-19. As early as March 2020, the Centers for Disease Control and Prevention issued warnings of potentially deadly outbreaks of COVID-19 in long-term care facilities.

31.   Upon information and belief, a State Survey resulted in Defendants' facility being cited on March 5, 2020 for not having sufficient staff, nonetheless the facility continued to cut direct nursing staff. In the words of facility staff "I am concerned we are being set up for failure, being forced to do more with less...." As of July 2020, only one nurse was found to be responsible

14

for memory care and Hall A. Thereafter, on July 27, 2020, the State Agency was informed that Defendants had eliminated a nurse from the memory care unit. On August 6, 2020, it was noted that all of the reviewed residents had numerous late medications administered over the past several months. Further review of the facility's Medication Administration Audit Report for August 5, 2020, showed that 30 of 52 residents had received medications administered late. All 13 residents in the Solana unit also received late medications as noted on August 5, 2020. A staff member stated during an interview conducted on August 6, 2020, that "the census and acuity of residents influenced staffing so they do not take residents that have a high acuity. The census had dropped since COVID and they have not adjusted since." This same staff member stated that staff turnover was high, especially the CNAs.

32.     Upon information and belief, Defendants' officials reported that by November 2020, 29 residents and 10 staff members at the Continental Care and Rehabilitation Center had tested positive for COVID-19.  At that time, 5 residents had died due to COVID-related causes. The number of deaths at the facility has thus far grown to at least 13 residents due to the Defendants' failure to take reasonable measures to control the outbreak or adhere to public health guidelines issued by the Montana Department of Public Health and Human Services, the Centers for Disease Control, and the Centers for Medicare and Medicaid and to properly maintain the underlying health of the residents leading into and during the outbreak.  As of November 23, deaths at the facility accounted half of all COVID-19 deaths in Silver Bow County.

33.     On August 5, 2020 to August 6, 2020, officials from the Montana Department of Public Health and Human Services conducted a COVID-19 "Focused Infection Control Survey" at the Continental Care and Rehabilitation Center.  The Montana Department of Public Health and Human Services documented that Continental Care and Rehabilitation Center was not in compliance with 42 §483.80 infection control regulations and had not implemented the Centers

for Medicare and Medicaid Services (CMS) and Centers for Disease Control and Prevention (CDC) recommended practices to prepare for COVID-19. The survey further documented that:

a. The facility's failure to establish and maintain an infection prevention and control program designed to provide a safe, sanitary and comfortable environment to help prevent the development and transmission of communicable diseases and infections, including the "lack" of appropriate and mandated social distancing precautions for residents.

b. The facility's failure to maintain sufficient nursing staff with appropriate competencies and skill sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with the facility assessment required at §483.70(e), §483.35(a)(1), and §483.35(a)(2).

c. The facility's failure to provide orientations to new staff members, sufficient staffing and assistance to CNAs, failure to provide proper care to residents due to insufficient staffing, residents being left unattended for hours, not receiving baths, and receiving medications late.

d. The facility's failure to ensure residents are provided basic ADL care and assistance in accordance with their plan of care including methods of transfer, bathing records and failure to give residents timely baths, showers, or bed baths.

e. The facility's Medication-Admin Audit Report for 8/5/20, showed 30 of 52 residents in the facility had received medications administered late. All 13 residents in the Solana unit received late medications on 8/5/20. Staff members also complained that residents on the Solana unit were being neglected and were concerned about medications not being given on time.

34.    The Montana Department of Public Health and Human Services August 5, 2020 to August 6, 2020, investigation at Continental Care and Rehabilitation Center identified numerous deficiencies and failure of management and staff in the management and care of residents, including:

a. Failure to timely administer baths, showers or bed baths to residents due to staffing shortages. Multiple residents were apparently not bathed for weeks at a time. Staff members were charting "NA" for dates that residents were not bathed, and cited staffing shortages as the primary cause of their inability to properly adhere to weekly bathing schedules for all residents;

b. Facility was cited for not having sufficient staff. Based on observations, interviews and records review, the facility failed to provide adequate nursing staff for 4 out of

16

20 sampled residents, and filed to provide adequate staff to assist and complete ADL care and bathing or showering;

c.  Facility was found to be deficient in administering scheduled medications timely for majority of residents in facility;

d.  Facility failed to provide a safe environment for staff and residents. These failures increased the risk of negative effects for the residents physical and psychosocial well-being;

e.  Staff members interviewed reported that one CNA would be scheduled for the entire day to take care of 10-15 residents. The residents would be alone in the unit, and it was difficult to get help from the nurse up front when help was needed in the unit. The staff member further indicated that residents were being neglected and was also concerned about medications not being given on time;

f.  Another staff member interviewed, indicated that prior to 7/27/20, there was 1 RN and 1 CNA scheduled from 6:00 a.m. to 10:00 p.m. and 1 RN and 1 CNA from 10:00 p.m. to 6:00 a.m. As of the date of the inspection, there was 1 CNA in the Solana unit, and the RN covered the Solana unit and Hall A, administering medications and providing patient care;

g.  Complaints by staff to management went unanswered and unresolved regarding staffing shortages. Staffing member was told by management "It will take time to get better, thank you for your concerns." Meanwhile, the staff member indicated problems with falls when working alone, especially with a new resident who had Parkinsons who would push himself out of his wheelchair;

h.  Other staff members indicated that some residents required 2-person showers. The staff members were concerned as to who would watch the unit under those circumstances, as the whole unit would then be unattended. Another staff member indicated that they were concerned about resident safety and care and keeping residents comfortable and that it worried the staff member, as they were being spread so thin and bad things like falls, injuries and weight loss are going to happen;

i.  A staff member interviewed advised that residents in the facility were not getting the care they needed because of the facility not having enough staff. The staff member advised that "residents were not receiving baths, receiving medications late, and being left unattended for hours;"

j.  Failure to administer medications timely had the potential to cause medication interactions, and loss of medication efficacy for relief of symptoms for the residents;

k.  Failure to implement proper "social distancing" of residents during mealtimes. The residents were not sitting 6-feet apart or on opposite sides of the table from each other. The social distancing standards were not complied with due to staffing

shortages. There was solely one CNA who had to assist multiple residents in eating. Therefore, social distancing standards were abandoned.

35.    As of August 6, 2020, the facility had not implemented proper disease and infection prevention procedures and a State "Focused Infection Control Survey" of that date instructed the Defendants' facility to immediately implement an Infection Prevention & Control program under and in compliance with CFR(s): 483.80(a)(1)(4)(e)(f). The facility is to establish an infection prevention and control program ("IPCP") that must include at a "minimum" the following elements:

a.  A system for preventing, identifying, reporting, investigating and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, and other individuals providing services under a contractual arrangement based upon the facility assessment conducted according to §483.70(e) and adherence to accepted national standards;

b.  Implementation of written standards, policies and procedures, to include:

(i)   A system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility;

(ii)  When and to whom possible incidents of communicable disease or infections should be reported;

(iii) Standard and transmission-based precautions to be followed to prevent spread of infections;

(iv)  When and how isolation should be used for a resident, including but not limited to (a) the type and duration of the isolation, depending upon the infectious agent or organism involved; and (b) a requirement that the isolation should be the least restrictive possible for the resident under the circumstances;

(v)   Circumstances under which the facility must prohibit employees with a communicable disease or infected skin lesions from direct contact with residents or their food, if direct contact will transmit the disease; and

(vi)  Hand hygiene procedures to be followed by staff involved in direct resident contact.

c.  A system for recording incidents identified under the facility's IPCP and the corrective actions taken by the facility.

18

d. Personnel to handle, store, process, and transport linens so as to prevent the spread of infection.

e. The facility is to conduct an annual review of its IPCP and update their program as necessary. This requirement was not met as evidenced by: observation, interview, and record review, which indicated that the facility failed to modify communal dining and to implement social distancing precautions for the residents in the C-wing dining hall.

36. Following the August 6, 2020 "Focused Infection Control Survey" and Statement of Deficiencies, the State mandated a "Directed Plan of Correction" to remedy the noted problems at the Defendants' facility requiring:

a. Facility and staff to immediately ensure C-wing dining room has social distancing measures in place and followed per CMS regulations and guidance of Centers for Medicare and Medicaid Services (CMS);

b. Facility to assess all residents eating meals in the C-wing dining room for symptoms of COVID-19 by August 26, 2020. All residents who exhibit symptoms are to have corrective actions and interventions implemented for the resident(s);

c. All staff working in the C-wing dining room, to have education on expected protective measures for social distancing related to COVID-19, to be completed timely upon receipt of the Directed Plan of Correction and no later than August 24, 2020;

d. All residents eating in the C-Wing dining room are to be assessed for signs or symptoms of COVID-19 and interventions implemented timely for any concerns identified, and correction to be completed by August 26, 2020;

e. Administrator and Director of Nursing are to review and determine if guidance is being followed by staff for infection control and prevention of COVID-19, as it relates to dining services, and correction to be completed by August 24, 2020;

f. Charge nurse scheduled on unit during mealtime will observe and monitor meal session on C-Wing to ensure protective measures are in place and followed for prevention and protection for COVID-19. Concerns are to be addressed timely by charge nurse for resident protection and communicated to Director of Nursing prior to nurse leaving shift;

g. Administrative staff to monitor floor staff working in dining room on C-Wing and residents during mealtime to ensure protective measures are in place and followed by staff/residents related to COVID-19, and social distancing. Documentation of monitoring to be maintained with the Administrator and concerns discussed daily

19

with the administrative team.  The Administrator and Director of Nursing are to re-educate all staff on the need to social distance and ensure protective measures are implemented and in place by August 28, 2020;

h. Administrative staff to audit/monitor floor staff working in the dining room on C-Wing after first two weeks of initial monitoring completed two times weekly to ensure protective measures are in place and followed by staff/residents related to COVID-19 and social distancing.  Documentation of audits to be maintained with the Administrator and concerns addressed and discussed daily with Director of Nursing for intervention, and audits to be forwarded to the QAPI committee each week for review and discussion.  The QAPI committee will then review dining audits for C-Wing to identify trends, patterns, or concerns identified, and ensure interventions implemented timely for correction, or determine if action is needed. QAPI to monitor deficient practice and audits for two months, and then monthly for two months. QAPI also to meet and determine if all corrections are completed for this deficient practice on August 27, 2020.

37.    Upon information and belief, agency records document that the above issues and infractions are only the most recent among a host of other deficiencies indicating a long-standing course of conduct at the Continental Care and Rehabilitation Center of failing to meet state and federal regulations and guidelines.  The health and hygiene of residents plummeted under the ownership and management of the Defendants.

38.    In its "Statement of Deficiencies and Plan of Correction," prepared on August 6, 2020 by the Department of Health and Human Services, Centers for Medicare and Medicaid Services, the public was made aware for the first time of Defendant's inexcusable failure to provide for the health and safety of its residents. The Statement of Deficiencies and Plan of Correction indicated in part, "The facility was NOT in compliance with 42 CFR §483.80 Infection Control and had not implemented the Centers for Medicare and Medicaid Services (CMS) and Centers for Disease Control and Prevention (CDC) recommended practices to prepare for and prevent the spread of COVID-19."

39.    Arthur Vidrich was admitted to Defendants' facility following a suspected stroke in March of 2018. Following Defendants' takeover of the facility, Mr. Vidrich's family members

20

took note and made attempts to voice their concerns to staff members that all former staff members by and large had been replaced and/or that there had been a significant decline in staffing creating severe staffing shortages at the facility. During his stay as a resident at the Defendants' facility, there were several reported incidents of Mr. Vidrich falling out of his bed without corrective measures being taken causing him to sustain abrasions and other injuries. At times, family members who visited in person with Mr. Vidrich at the facility complained that Mr. Vidrich's room smelled like urine, trash cans in his room were overflowing and there was trash also seen on the floor of Mr. Vidrich's room. On other occasions, when family members went to visit with Mr. Vidrich, they found him to be sitting in soiled clothing. At other times, upon visitation at the facility, Mr. Vidrich's family members found Mr. Vidrich to be dressed in clothing that did not belong to him and that his clothing was continually dirty and soiled (with urine and feces). Additionally, Mr. Vidrich was a diabetic, and family members further found candy on trays in Mr. Vidrich's room, cookies and drinks that contained sugar even though family members continually instructed the facility and staff as to Mr. Vidrich's diabetic condition. Following the March 9, 2020 COVID-19 shutdown of the facility, Mr. Vidrich's family members were not allowed to see or monitor Mr. Vidrich's care that was of grave concern as it appeared that Mr. Vidrich was left in his bed all day without any activities or therapy that caused a severe decrease in his mobility, health and well-being. Due to lack of staff and family members' inability to get someone to answer phones or return calls at the facility, it was largely impossible for Mr. Vidrich's family members to be able to keep up with and to monitor the purported care and well-being of Mr. Vidrich. In late October 2020, family members received a phone call from the facility's nurse advising that Mr. Vidrich was COVID-19 positive. Throughout the month of October, after finding out that Mr. Vidrich was COVID-19 positive, nearly daily phone calls were made to the facility to check on Mr. Vidrich's welfare and to inquire as to whether there was a need to hospitalize Mr. Vidrich due

21

to his COVID-19 condition.  Family members were constantly assured that in spite of his COVID-19 condition, that Mr. Vidrich was doing well.  Then, on November 6, 2020, Mr. Vidrich's family members spoke with a traveling nurse at the facility who informed them that Mr. Vidrich was well.  Ten minutes later, the same traveling nurse contacted Mr. Vidrich's family members and informed them that they "better get here to see" Mr. Vidrich.  Mr. Vidrich's son instructed the traveling nurse to immediately transfer his father to the hospital.  Once admitted to the hospital on November 6th, it was noted that Mr. Vidrich had Stage IV bed sores on his back, a sore on his leg, sores on his feet, and that he was experiencing debilitating pain.  Mr. Vidrich then sadly died later that day due to COVID-19, and the delay in treatment needed to save his life by his late admission to the hospital by the Defendants' facility.

35.     Prior to the COVID-19 outbreak at Defendants' facility, Michelle Sullivan had been a resident at the facility for six years. After the Defendants' took over ownership and management of the facility, Mrs. Sullivan's care declined sharply including being left in her wheelchair for many hours, being left in bed for prolonged periods, being dropped twice from the transfer lift, inappropriate medication administration, and not receiving appropriate bathing, activity, or hygiene services. As a result, her condition deteriorated including the progression of multiple bedsores and repeated bouts of urinary tract infection, requiring her to have multiple admissions to the hospital.  Following the COVID-19 outbreak and closure at the Defendants' facility, Mrs. Sullivan's family members were no longer able to visit or monitor the care and well-being of Mrs. Sullivan. During the COVID-19 outbreak, her family members began receiving unsolicited phone calls from prior employees and staff members of the Defendants' facility warning them of severe staffing shortages, the insufficient care received by residents, and recommending that they attempt to transfer their mother out of the Defendants' facility. On October 26, 2020, Mrs. Sullivan was transferred from the Defendants' facility to St. James Hospital, following her testing positive for

COVID-19. Mrs. Sullivan was then discharged back to the Defendants' facility on October 26th. She was again sent back to the hospital on October 28 for treatment of COVID-19 pneumonia. At the time, there were a reported 26 COVID-19 positive diagnosed cases at the Defendants' facility and 5 deaths as per a voicemail received by family members from the facility. Upon admission, Mrs. Sullivan was found to be struggling to breathe and she remained an inpatient at the hospital until November 10, 2020. Throughout this period, Mrs. Sullivan medication regime was not adhered to and as one example she was administered dangerous levels of lithium medication for reasons presently unknown to her family members, which created toxic lithium levels in her body and blood and resulted in yet to be fully determined injury. Mrs. Sullivan continues to suffer from the unnecessary injuries she has incurred as a result of the lack of reasonable care she has received at the facility.

36.     Diane M. Mulcahy had been a resident at the Defendants' facility since 2015. Mrs. Mulcahy suffered from Alzheimer's Disease, requiring 24-hour nursing care. Mrs. Mulcahy was unable to self-transfer and was wheelchair bound. After the Defendants assumed ownership and management of the facility, Mrs. Mulcahy's family members noticed a significant change in care and significant lack of sufficient staffing. The constant change and turnover of staff caused Mrs. Mulcahy to suffer from fear and agitation as to the lack of any continuity and familiarity with her caregivers. Due to the lack of reasonable care, Mrs. Mulcahy's personal hygiene suffered as she had insufficient bathing and showering, causing her to develop multiple urinary tract infections (UTI's), nail fungus, multiple bouts of pneumonia and excessive weight loss. At one point, Mrs. Mulcahy's upper dentures were stolen by a resident and due to the delay in replacement she developed severe gum sores. Prior to the facility's shutdown due to COVID-19, family members would visit daily with Mrs. Mulcahy and assisted in her care and comfort. Once the facility was closed due to COVID-19, her family was unable to monitor her care and treatment. Mrs. Mulcahy

23

contracted COVID-19 at the Defendants' facility on October 26, 2020. Mrs. Mulcahy subsequently lost consciousness and died at the Defendants' facility from COVID-19 on November 5, 2020. In her final days, Mrs. Mulcahy's daughter was allowed to be at her bedside. Her mother never regained consciousness and was in excruciating pain. Mrs. Mulcahy suffered greatly the last five days of her life.

37.    Donna Kelly was admitted to the Defendants' facility in April 2018. Mrs. Kelly suffered from Alzheimer's Disease, requiring 24-hour nursing care and was unable to self-transfer. After the Defendants took over ownership and management of the facility, family members noticed that all of the long-term staff members who had delivered great care to Mrs. Kelly were either fired or left, and that new staff members were not qualified for their assigned positions. Following closure of the facility due to COVID-19, Mrs. Kelly's family members were no longer able to visit or to monitor the care being given to Mrs. Kelly until July of 2020. At that time, Mrs. Kelly was hospitalized due to her development of a urinary tract infection (UTI) and sepsis from lying in her own urine. At the hospital, Mrs. Kelly's family members were able to visit with her, and were advised by the ICU nurse that Mrs. Kelly was in sepsis shock when she was admitted to the hospital. Additionally, the family was informed that Mrs. Kelly had blood blisters all over her legs. Due to the lack of reasonable care received at the Defendants' facility, Mrs. Kelly developed multiple bedsores on her tailbone and heels, and she suffered extreme weight loss. In July 2020, Mrs. Kelly weighed 170 lbs., and at the time of her death her weight had dropped to 118 lbs. Mrs. Kelly's family members were first advised that Mrs. Kelly had contracted COVID-19 at the Defendants' facility on November 8, 2020. From November 9 – 13, 2020, family members made daily phone calls to the Defendants' facility and were advised that Mrs. Kelly was doing fine. On November 14th, the family had a Facebook messenger call with Mrs. Kelly. Her family then received a phone call on November 16th, advising that Mrs. Kelly had made a turn for the worse

24

and were told they could come into the facility to meet with Mrs. Kelly at their own risk. Mrs. Kelly died at the Defendants' facility from COVID-19 on November 17, 2020.

38.    Linda Sue Fabian had been hospitalized in Butte for MRSA (on her leg) in October 2020. She was admitted to the Defendants' facility for short-term care on October 17, 2020. Ms. Fabian contracted COVID-19 at the Defendants' facility on October 28, 2020. Ms. Fabian called her sister Heidi Bara to advise that she had contracted COVID-19, after the Defendants moved COVID-19 positive residents into her wing. Ms. Fabian died at the Defendants' facility from complications of COVID-19 on October 30, 2020. Ms. Bara never received a phone call from the Defendants advising that her sister had tested positive for COVID-19, to let her know that she was deteriorating quickly or that she needed to be hospitalized. Ms. Bara learned that her sister died from her nephew who had been notified by Ms. Fabian's boyfriend. Although Ms. Bara was the point of contact and sole surviving sibling, she was not contacted by the Defendants to advise of her sister's death. Prior to her death, Ms. Fabian suffered from a lack of reasonable care at the facility. Ms. Fabian advised her sister that she never received a bath or shower the entire time that she had been a resident at the Defendants' facility. Due to the Defendants' failure to separate COVID-19 positive residents from COVID-19 negative residents to prevent the spread of COVID-19 transmission among residents, Ms. Fabian was caused to contract COVID-19 and as a result died from her exposure to COVID-19 at the Defendants' facility.

39.    Emmett Waddell was admitted to the Defendants' facility following a brain injury in June 2020. Mr. Waddell requires 24-hour care and assistance with transfer. Since his admission to the Defendants' facility, Mr. Waddell has suffered from a lack of reasonable care resulting in his having numerous falls without corrective measures being taken. As a result, he has sustained injuries to his head and left knee requiring additional medical care. Mr. Waddell waits weeks to be bathed or showered, and is left in soiled diapers for hours on end. On multiple occasions he has

25

been left on the toilet for over an hour and a half causing his legs to swell or he has been left in a bed pan for over 45-minutes, causing his extremities to swell. There have been many instances where Mr. Waddell does not receive his medication timely or the correct medication, and at times has had to wait more than 12-hours for his medication, causing him to suffer increased jerking and tremors. Additionally, Mr. Waddell is not able to feed himself, and in many instances does not receive the help he needs in order to be able to eat which has caused him to sustain excessive weight loss.

40. Upon information and belief, throughout the above referenced events, Defendant David Merrell was charged with executing Defendants' non-medical business and management decisions at the Continental Care and Rehabilitation Center. Mr. Merrell had firsthand on the ground knowledge of the resulting deficiencies at the Continental Care and Rehabilitation Center including Defendants' actions and failures to act which led to Plaintiffs' injuries. Mr. Merrell took part in the business decision to understaff and underfund the facility resulting in a lack of reasonable care and neglect throughout the facility. In addition, throughout the above referenced events, Mr. Merrell had knowledge of the dangers associated with COVID-19 and knew of the need to make appropriate changes to the facilities services, supervision, and care in order to prevent the spread of COVID-19. Nonetheless, Mr. Merrell and his co-Defendants ignored complaints, guidelines, and agency recommendations and requirements, and allowed the unsafe conditions that existed at the Continental Care and Rehabilitation Center to persist -resulting in nearly the entire population of residents at the facility -becoming infected with COVID-19.

41. Upon information and belief, at least 13 people, including Mr. Vidrich, Mrs. Mulcahy, Mrs. Kelly, and Ms. Fabian have thus far died from a COVID-19 outbreak at Defendant's facility, and many others, including Mrs. Sullivan have unnecessarily contracted COVID-19 and will potentially suffer from associated lifelong health complications, and many

others have been otherwise injured as a result of the actions and inactions of Defendants resulting in the lack of reasonable care provided to residents including Mrs. Sullivan and Mr. Waddell.

42.    Plaintiffs explicitly disclaim any claims for loss caused by, arising out of, relating to, or resulting from the administration or the use of COVID prevention devices, equipment, or products including respirators, gowns, tests, medications, drugs, respiratory devices, or other similar items.  Plaintiffs' claims in regard to their contraction of COVID, which are secondary to their claims regarding neglect, relate only to Defendants failure to establish and maintain a basic and reasonable infection prevention and control program designed to provide and maintain a safe and sanitary environment for this at-risk population of residents; failure to provide for and follow public health guidelines issued by the Montana Department of Public Health and Human Services and the Centers for Medicare and Medicaid regarding the prevention of COVID-19 at its nursing care facility; failure to maintain reasonable distancing among residents; inadequate staffing; inadequate training of staff; and failure to appropriately respond to complaints, warnings, and violations of regulations, recommendations, and guidelines.  These claims are exclusive of any requirements or guidelines requiring or recommending the facilities use of specific COVID prevention devices, equipment, or products.  To the extent any such specific COVID prevention devices, equipment, or product were used, they could only have prevented the infections suffered by Plaintiffs and are therefore, not a subject of Plaintiffs' claims sounding primarily in neglect and secondarily in a complete lack of a basic and reasonable infection prevention and control program designed to provide and maintain a safe and sanitary environment for this at-risk population of residents at the facility.

<u>**CAUSES OF ACTION**</u>

**Count 1: Negligent Care**

43.    Plaintiffs incorporate by reference all previously plead paragraphs set forth herein.

27

44.    Defendants owed Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly impacted individuals a duty to provide for services, supervision, and care for their general health and safety, which included a duty to establish and maintain an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment designed to prevent the development and transmission of communicable diseases and infections.

45.    Defendants breached their duty of care to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly impacted individuals including by any or all of the following: failing to provide adequate care, services or attention to Plaintiffs; failing to adequately staff and supply its facility; failing to adequately inform and train facility staff; rooming presumptive COVID-19 positive residents with COVID-19 negative residents; not using signage or not using correct signage for infection control protocols; not properly training and supervising Defendants' employees on COVID-19 and infection control, including but not limited to recognizing COVID-19 signs, symptoms, and modes of transmission ; not properly training and supervising Defendants' employees to assist residents with maintaining social distancing standards, and/or to intervene when residents and visitors were not maintaining social distancing standards; and generally failing to adhere to and follow federal and state guidelines and regulations in this regard.

46.    Defendants knew of the dangers associated with COVID-19 and knew of the need to make appropriate changes to its services, supervision, and care, yet Defendants acted with actual malice by either deliberately proceeding to act in conscious, intentional, or reckless disregard of the high probability of injury to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly impacted individuals, or deliberately proceeding to act with indifference to the high probability of injury to Arthur Vidrich,

28

Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals.

47.    Defendant David Merrell was additionally personally negligent and his actions were tortious in nature in declining to take appropriate action to prevent COVID-19 infection among staff and residents at the Continental Care and Rehabilitation Center despite his firsthand knowledge of conditions and deficiencies at the facility as well as the dangers associated with COVID-19, declining to properly staff, fund, and maintain the facility, and declining to provide a reasonable standard of care to residents.

48.    Plaintiffs suffered injuries and damages, including for survival and wrongful death, as a direct and proximate result of Defendants' negligence.

### Count 2: Negligent Management

49.    Plaintiff incorporates by reference all previously plead paragraphs set forth herein.

50.    Defendants made and executed non-medical business and management decisions with the motivation of reducing the cost of operation of the Defendants Sweetwater facilities in Montana, including the Continental Care and Rehabilitation Center.

51.    These non-medical business and management decisions included: greatly reducing staffing and the number of staff members present during facility operation; hiring and assigning a single administrator to manage multiple facilities located many miles apart in different Counties; failing to provide, fund, or arrange proper training of their staff regarding disease prevention, COVID-19 protocols and recommendations, and reasonable care of assistance dependent residents; failing to mandate that staff adhere to disease and illness protection requirements and guidelines; and failing to adequately maintain, clean, and sterilize the facility.

52.    These non-medical business and management decisions resulted in a failure of reasonable care for the residents including in regards to:  showers/bathing; ensuring proper

29

nutrition; physical therapy and activity; turning of patients that required these services to avoid the development of bed sores; clean and sanitary rooms, bathrooms, clothes, and sheets; regular changing of briefs, catheters, catheter bags, and necessary medical equipment and devices; maintenance, cleanliness, and sterilization of the facility, equipment, and appliances; regular bathroom visits for those who require bathroom assistance; responsiveness to patient call lights/assistance requests; responsiveness to family member inquiries and complaints; appropriate disease prevention requirements, regulations, recommendations, and protocols; maintaining appropriate distancing between residents during the COVID-19 pandemic; separation of COVID-19 positive residents from COVID-19 negative residents; preventing the spread of COVID-19 transmission between and among residents and staff; preventing other infections including those of the urinary tract and open sores; meeting medical needs of clients; and otherwise ensuring the safety and health of the residents.

53.    Because of the Defendants business decision to greatly reduce on-shift staff members alone, the hard-working CNAs and RNs at the facility were unable to meet their reasonable care obligations to the Residents.  As a result, residents would: regularly go long periods without being bathed; not have clean and sanitary clothes, bedsheets, rooms, or bathrooms; not receive personal care within a reasonable schedule; not receive timely brief changing or bathroom assistance; not receive necessary activity time or physical therapy; at times not receive their regularly scheduled medicines, and; would not be able to reach staff in a reasonably timely manner.  In addition, residents who required assistance with eating their meals were not receiving necessary assistance in this regard, and residents who required turning were not receiving appropriate assistance.

54.    Based on information and belief, the Defendants' non-medical business and management decisions recklessly left Sweetwater Butte Opco, LLC, d/b/a Continental Care and

Rehabilitation Center underfunded and likely under-insured, resulting in an inability to reasonably operate the facility and likely unable to cover the facility's financial obligations and liabilities.

55.    From a business management standpoint, Defendants either: approved of the lack of reasonable care and conditions at the facility; failed to adequately oversee, inspect, and/or intervene in facility operation; or chose to ignore the evidence and indications of the lack of reasonable care and conditions at the facility. The Defendants' failure to make reasonable business and management decisions in this regard, and their failure to take corrective action through reasonable business and management decisions once the lack of reasonable care and conditions became evident, constitutes managerial or business negligence.

56.    Defendants knew, or should have known, of the conditions at the facility, the dangers associated with COVID-19 and knew of the need to make non-medical business and management decisions to ensure the provision of reasonable services, supervision, and care, yet Defendants breached their duties and acted with actual malice by either deliberately proceeding to act in conscious, intentional, or reckless disregard of the high probability of injury to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly impacted individuals, or deliberately proceeding to act with indifference to the high probability of injury to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals.

57.    Defendants Kyle Shields, Jordan Holt, and Aaron Chesley were additionally personally managerially negligent and their actions were tortious in nature in declining to make appropriate business and management decisions to ensure residents were receiving reasonable care and to prevent COVID-19 infection among staff and residents at the Continental Care and Rehabilitation Center despite their firsthand and constructive knowledge of conditions and deficiencies at the facility as well as the dangers associated with COVID-19.

31

58.     Plaintiffs suffered injuries and damages, including for survival and wrongful death, as a direct and proximate result of Defendants' negligence.

### Count 3: Negligence *Per Se*

59.     Plaintiff incorporates by reference all previously plead paragraphs set forth herein.

60.     Defendants owed Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals a duty to comply with the Montana Elder and Persons with Developmental Disabilities Abuse Prevention Act, set forth in § 52-3-801 et seq., M.C.A., and federal public health regulations set forth in 42 C.F.R. § 483.80(a), (e), and (f).

61.     Defendants breached their duty to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals by not complying with the foregoing state and federal laws and regulations.

62.     The foregoing state and federal laws and regulations were enacted to prevent the abuse and neglect of elderly persons and persons with developmental disabilities. Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals were members of that protected class.

63.     Plaintiffs and the other similarly situated individuals suffered injury and damages, including for survival and wrongful death, as a direct and proximate result of Defendant's negligence *per se*, and their injuries and damages were of the sort which the foregoing state and federal laws and regulations were enacted to prevent.

### Count 4: Breach of Contract and Unjust Enrichment

64.     Plaintiffs incorporate by reference all previously plead paragraphs set forth herein.

65.     Defendants entered into, or assumed the terms of, agreements, with attendant covenants of good faith and fair dealing, with Arthur Vidrich, Michelle Sullivan,  Diane M.

32

Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals (and/or their representatives) to provide reasonable and adequate care and services which imposed an obligation to establish and maintain an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment, and designed to help prevent the development and transmission of communicable diseases and infections. Defendants breached the agreements by failing to provide reasonable and adequate care and services and failing to establish and maintain an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment, and designed to help prevent the development and transmission of communicable diseases and infections. Defendants' breach of the agreement with Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals caused Plaintiffs to suffer injuries and attendant damages, all while unjustly enriching Defendants.

## Count 5: Violation of § 30-14-101 *et. seq.*

## (Montana Consumer Protection Act)

66.    Plaintiffs incorporate by reference all previously plead paragraphs set forth herein.

67.    The Montana Unfair Trade Practices and Consumer Protection Act of 1973 prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

68.    Arthur Vidrich and Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, and Emmett Waddell were, at all times relevant, consumers pursuant to the Montana Consumer Protection Act ("MRCA") § 30-14-101 *et. seq.*, MCA.

69.    Defendants engaged in unfair and/or deceptive acts or practices in the conduct of its commerce or trade, including but not limited to: (1) misrepresenting to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell (and/or their

33

representatives) the scope of its abilities, services and capabilities of its staff; (2) misrepresenting and/or omitting the conditions of Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell to avoid losing them as residents; and (3) continuing to retain Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian and Emmett Waddell= while concealing dangerous health conditions despite knowing the high risk of injury Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell.

70.    Plaintiffs suffered damages including payment of rents under false promises, physical, emotional, and financial suffering as a result of Defendants' unfair and deceptive acts and conduct towards Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian and Emmett Waddell. Plaintiffs are entitled to an award of all damages available under Montana law.

### Count 6: Violation of Plaintiffs' Right to Dignity

71.    Plaintiffs incorporate by reference all previously plead paragraphs set forth herein.

72.    Art. II, Sec. 4, of the Montana Constitution provides that, "The dignity of the human being is inviolable." The treatment which Plaintiffs received from Defendants degraded and demeaned them as persons, which treatment failed to acknowledge their worth as persons, and which treatment directly violated their constitutional right to dignity.

73.    Plaintiffs suffered injury and damages as a direct and proximate result of Defendants' violation of their constitutional right to dignity.

### Count 7: Wrongful Death

74.    Plaintiffs incorporate by reference all previously plead paragraphs set forth herein.

75.    As a direct and proximate result of the actions and inactions of the Defendants as alleged above, Plaintiffs Arthur Vidrich, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian and the other similarly situated individuals unnecessarily contracted COVID-19, experienced unnecessary complications related to COVID-19, and/or were neglected, abused, malnourished or otherwise mistreated, and have died as a result, incurring the damages alleged herein.  Plaintiffs' heirs have suffered the loss of consortium, comfort, care, support, society, and companionship of their deceased loved ones and have incurred the damages as alleged herein.

### Count 8: Conspiracy

76.    Plaintiff incorporates by reference all previously plead paragraphs set forth herein.

77.    Acting in concert, the Defendants conspired to unjustly enrich themselves by drastically reducing funding, staffing, and financial investment at the Sweetwater facility, and/or failing to take corrective actions when the lack of reasonable care and conditions at the facility became evident.

78.    The object of the Sweetwater Defendants conspiracy was to dangerously reduce the cost of operation of the facility and to increase financial returns from the business despite the resulting obvious insufficient care provided to residents and the inability to provide the heightened monitoring, attention, staffing, and care requirements associated with the ongoing pandemic.

79.    Based on information and belief, insufficient income from the operation of Sweetwater Butte Opco, LLC, d/b/a Continental Care and Rehabilitation Center, was directed towards the reasonable and proper operation of the facility, and was instead channeled, directly or indirectly through other shell entities, to Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Chesley, other Sweetwater entities, other associated entities, and/or other individual owners, managing members, or shareholders.

80.    Defendants had a meeting of the minds regarding such conspiracy.

35

81.     Defendants took one or more unlawful overt acts in furtherance of such conspiracy.

82.     Upon information and belief, Defendants' conspiracy in this regard likely extends to their numerous other Sweetwater LLCs and associated care and rehabilitation facilities in Montana and across the Nation.

83.     Defendants conspiracy in this regard, and other as yet unknown unlawful action in furtherance of their conspiracy, caused Plaintiffs harm in an amount to be proven at trial.

### Count 9: Alter Ego

84.     Plaintiff incorporates by reference all previously plead paragraphs set forth herein.

85.     The identity of the Sweetwater Entity Defendants, including Continental Care and Rehabilitation Center (d/b/a); Sweetwater Butte Opco, LLC; Sweetwater Care MT OPCO, LLC; Sweetwater Care OPCO LLC; Sweetwater Care Propco, LLC; Sweetwater Care Resource, LLC; Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, as well as other Sweetwater related corporate entities referenced in this complaint or yet to be discovered, are one and the same. Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett and/or other individual owners, managing members, or shareholders referenced in this complaint or yet to be discovered, operate these companies and facilities with common ownership, shareholders, officers, directors and managers, common offices, shared insurance policies and coverages, centralized accounting, payment of wages by one entity to another entity's employees, common business names, services by employees of one entity on behalf of another entity, common insurance policies and coverages, and/or unclear, uneven, or self-serving allocation of profits and losses between entities.

86.     Based on information and belief, insufficient income from the operation of Sweetwater Butte Opco, LLC, d/b/a Continental Care and Rehabilitation Center was directed towards the reasonable and proper operation of the facility, and was instead channeled, directly or

indirectly through other shell entities, to Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, other Sweetwater entities, other associated entities, and/or other individual owners or shareholders.

87.     These Sweetwater Entity Defendants are the alter ego of Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Chesley, and/or other individual owners and shareholders yet to be discovered, acting solely as conduits for the performance of their business and as a subterfuge to avoid liability and responsibility for the negligent operation, ownership and management decisions of such facilities, defeat public convenience, justify wrong, or perpetrate fraud on persons dealing with them.

88.     The fabricated corporate boundaries and designations of these Sweetwater Entity Defendants should be disregarded, and Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Chesley, and/or the other individual owners yet to be discovered should be held liable for all sums owed to Plaintiffs.

## Count 10: Common Enterprise

89.     Plaintiff incorporates by reference all previously plead paragraphs set forth herein.

90.     Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Chesley and/or the other individual owners yet to be discovered are the primary shareholders, directors, managers, parent companies, or affiliated/associated entities of, the Sweetwater Entity Defendants, the Continental Care and Rehabilitation Center, at least three other similar facilities in Montana (Whitefish Care and Rehabilitation Center in Whitefish, Park Place Transitional Care and Rehabilitation Center in Great Falls, and Pioneer Care and Rehabilitation Center in Dillon), multiple skilled nursing centers and residential living facilities in other states, and numerous other active closely held corporations or limited liability companies, organized under the laws of the state of Montana (Sweetwater GF

37

Opco, LLC, Sweetwater GF Propco, LLC, Sweetwater Whitefish Opco, LLC, Sweetwater Dillon Opco LLC, Sweetwater Dillon Propco, LLC) and other States (Sweetwater Care a/k/a Sweetwater Care MT Opco, LLC, Sweetwater Care Opco, LLC; Sweetwater Care Propco, LLC, and Sweetwater Care Resource, LLC) created with a primary purpose of avoiding liability and responsibility for the operation, ownership and management decisions of such facilities and defeating public convenience. Upon information and belief, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity is an owner, primary shareholder, parent company, or affiliated/associated entity of numerous other Sweetwater LLCs created under the laws of this and other State's for the purpose of owning, managing, operating, and channeling income and profits from these and other similar care facilities across the nation.

91.    Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Chesley, and/or the other individual owners yet to be discovered, operate these companies and facilities as a common enterprise with common management, common employees, common offices, common insurance policies and coverages, centralized accounting, payment of wages by one company to another company's employees, common business names, services by employees of one company on behalf of another company, and/or unclear allocation of profits and losses between entities.

92.    Based on information and belief, insufficient income from the operation of Sweetwater Butte Opco, LLC, d/b/a Continental Care and Rehabilitation Center was directed towards the reasonable and proper operation of the facility, and was instead channeled, directly or indirectly through other shell entities, to Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Chesley, other Sweetwater entities, other associated entities, and/or other individual owners or shareholders.

38

93.    The existence of the Sweetwater Corporate Defendants, Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Shields, the other Sweetwater entities, and/or the other individual owners yet to be discovered, as separate entities should be disregarded, and Sweetwater Investment Management, LLC d/b/a Sweetwater Private Equity, James Gamett, Aaron Chesley and/or the other individual owners yet to be discovered should be held liable for all sums owed to Plaintiffs and the class.

### Count 11: Punitive Damages

94.    Plaintiffs incorporate by reference all previously plead paragraphs set forth herein.

95.    Defendants are guilty of actual malice as, defined in § 27-1-221(2), MCA, in that Defendants had knowledge of facts or intentionally, consciously, and recklessly disregarded facts that created a high probability of injury to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals, and Defendants either deliberately proceeded to act in conscious, intentional or reckless disregard of the high probability of injury to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly impacted individuals, or deliberately proceeded to act with indifference to the high probability of injury to Arthur Vidrich, Michelle Sullivan, Diane M. Mulcahy, Donna Kelly, Linda Sue Fabian, Emmett Waddell and the other similarly situated individuals.

96.    In order to prevent future repetition by these Defendants or others, an award of punitive damages is appropriate to serve as a judicial exemplar of the consequences that befall those who act with a reckless failure to treat elderly and disabled Montana citizens with the respect and care they deserve and that our society recognizes they are owed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment against Defendants as follows:

1.    For compensatory damages caused by Defendants to Plaintiffs in an amount to be proven at trial;

2.    For damages, pursuant to MCA § 27-1-513, attendant to survival and wrongful death, including but not limited to loss of consortium, comfort, care, support, society, and companionship;

3.    For treble damages and attorneys' fees pursuant to MCA § 30-14-101 *et. seq.*;

4.    For punitive damages as provided by law in a reasonable amount to be proven at trial;

5.    For costs, interest, and pre-judgment interest as determined by the Court; and

6.    For any and all further legal or equitable relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury in this matter.

Dated this 27th day of January, 2021.

HEENAN & COOK

*/s/John Heenan*
John Heenan
Joe Cook

McGARVEY LAW

*/s/Roger Sullivan*
Roger Sullivan
Ethan A. Welder
Dustin A. Leftridge
Jinnifer Jeresek Mariman

*Attorneys for Plaintiffs*

40

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of January, 2021, I caused to be served a copy of the

foregoing instrument by electronic mail and by first class mail, postage prepaid and self- addressed

to the following counsel of record:

Robert M. Carlson (SBN 236)
Corette Black Carlson & Mickelson
129 W. Park St., te 301
Butte, MT 59701
Telephone: (406) 782-5800
bcarlson@cpklawmt.com

-and-

Michael P. West, Esq. (SBN 172478)
Clark Hill LLP
600 West Broadway, Suite 500
San Diego, CA 92101
Telephone: (619) 557-0404
mwest@clarkhill.com
*Pro Hac Vice*

-and-

Maria Fracassa Dwyer (SBN P60946)
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
Telephone: (313) 309-9474
mdwyer@clarkhill.com
*Pro Hac Vice*
*Attorneys for Defendants,*
*Whitefish Care and Rehabilitation Center (d/b/a);*
*Sweetwater Whitefish Opco, LLC;*
*Weetwater Care MT OPCO, LLC;*
*Sweetwater Care OPCO, LLC;*
*Sweetwater Care Resource, LLC;*
*Reid Crickmore, James Gamett; Aaron Chesley; Kyle Shields*

William P. Cole
David Sugden

Call & Jensen, APC
610 Newport Center Drive, Suite 700
Newport Beach, California 92660
Telephone: (949) 717-3000
wcole@calljensen.com
dsugden@calljensen.com
*Pro Hac Vice*

-and-

Chad E. Adams
Browning, Kaleczyc, Berry & Hoen, P.C.
800 N. Last Chance Gulch, Suite 101
P.O. Box 1697
Helena, MT 59601
Telephone: (406) 443-6820
chad@bkbh.com
*Attorneys for Sweetwater Investment Management, LLC*


                                              */s/ John Heenan*
                                              John Heenan